In re Ralph G. CANNING, III and Megan L. Canning, Debtors.

Ralph G. Canning, III and Megan L. Canning

v.

Beneficial Maine, Inc., HSBC Mortgage Services, Inc., and HSBC Mortgage Corp.

Bankruptcy No. 09–20263.
Adversary No. 09–02080.

United States Bankruptcy Court,
D. Maine.

Feb. 17, 2011.

Tanya Sambatakos, Esq., Biddeford, ME, for Plaintiff.

Gayle Allen, Esq., Portland, ME, Peter Haley, Esq., Sean Higgins, Esq., Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

JAMES B. HAINES, JR., Bankruptcy Judge.

On a stipulated record, the parties have submitted the question whether the defendants are vulnerable to sanctions for violating the Bankruptcy Code's discharge in-

junction.[1] Chapter 7 debtors Ralph and Megan Canning assert that Beneficial Maine, Inc.; HSBC Mortgage Services, Inc.; and HSBC Mortgage Corp., (collectively, "HSBC") did so in two ways: first, through post-discharge correspondence asserting that the Cannings' personal obligation to repay a mortgage endured; and, second, by refusing to immediately foreclose upon the Cannings' surrendered home or, alternatively, to release the mortgage held against it. I conclude that HSBC's post-discharge correspondence violated the discharge injunction while its refusal to act upon its mortgage did not.

### Facts[2]

The Cannings voluntarily filed for relief under chapter 7 of the Bankruptcy Code in March 2009. HSBC was listed as a creditor on the bankruptcy schedules, and received actual notice of the filing. Consistent with their obligations under the Code, the Cannings filed a "statement of intention" declaring they would "surrender" their home.[3] HSBC's claim against the debtors was secured by a mortgage on the Cannings' Sanford, Maine residence and at the time the bankruptcy was filed it was prosecuting a state court foreclosure action.

In due course, the Cannings received their bankruptcy discharge.[4] About two months later, HSBC, whose foreclosure action had been stayed by the bankruptcy, informed the Cannings by letter that it was electing not to proceed with foreclosure. The letter stated:

Subject: MORTGAGE UPDATE

Dear Valued Customer:

This letter is to inform you that HSBC will not initiate and/or complete foreclosure proceedings on [the Sanford residence]. You will retain ownership of the property.

HSBC also relinquishes possession of the property. In addition, we will no longer advance any payments for taxes and insurances. You will be solely responsible for the payment of taxes, insurance, and the maintenance of this property.

Per the terms of your Loan Agreement, you still have a financial obligation to repay HSBC for the money that was borrowed. This financial obligation to repay HSBC or applicable successor remains intact, and HSBC reserves all rights and remedies under the terms of your Agreement.

If you have questions, please contact us at 1–800–365–6730.

You may also visit *http://www.hsbc mortgageservices.com* to manage your account online.

Sincerely,

HSBC[5]

The Cannings' counsel responded to the letter, reminding HSBC that it was "prohibited from attempting to collect" its debt from the Cannings as, after discharge, her

---

1. References to the "Bankruptcy Code" or the "Code" are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 101, *et seq.* Statutory section citations not otherwise identified are to sections of the Code.

2. The parties have submitted the liability issue for decision on a stipulated record which appear in adversary case 09–02080, Docket No. 33.

3. Bankruptcy Case 09–20263, Chapter 7 Individual Debtor's Statement of Intention, dated March 5, 2009, Docket No. 1; § 521(a)(2); Fed. R. Bankr.P. 1007–1(b)(2).

4. Bankruptcy Case 09–20263, Discharge Order, dated June 3, 2009, Docket No. 8.

5. HSBC letter dated August 12, 2009, Stip. Ex. 4. *See also* Stip. Ex. 13 (May 9, 2009) notice of dismissal without prejudice of state court foreclosure action.

clients no longer had a legal obligation to pay.[6] She demanded that HSBC withdraw its demand for payment in writing within ten days.[7] She then stated:

> HSBC must either [sic] do one of the following: 1) immediately commence foreclosure proceedings or 2) immediately discharge the mortgage on the property. Failure to act will result in further violation of the discharge injunction.[8]

HSBC did not respond, and on October 1, 2009, debtors' counsel wrote again, declaring that, since HSBC had not withdrawn its demand for payment, it was required to execute and record a formal discharge of the mortgage encumbering the Sanford real estate. In closing, she stated, "If I am not in receipt of the executed Discharge of Mortgage by October 13, 2009, I will seek a remedy with the bankruptcy court for your violations of the discharge injunction provision." [9] Two and a half weeks later, HSBC responded:

> We apologize for any inconvenience you have experienced while attempting to resolve this issue. This is the first request this department has received from your office. Our records confirm that Mr. and Mrs. Canning filed [c]hapter 7 [b]ankruptcy on March 5, 2009 and the bankruptcy was discharged on June 3, 2009. Although the account was included in the chapter 7 bankruptcy, there is still a lien balance that will need to be satisfied. Unfortunately, we are unable to honor your request to release the lien until the lien balance is satisfied in the

amount of $186,324.18. However, we could consider a settlement option or a short sale. Please be advised Mr. and Mrs. Canning's account was charged off on June 27, 2009. Mr. and Mrs. Canning's account is now with the Recovery Management Services (RMS) Bankruptcy Department and you may contact them via facsimile at (877) 829–6944 or directly at (800) 562–7830, and speak with Roshan Anand, regarding any questions that you may have or to discuss a settlement offer or a short sale.

> Please note that this is not an attempt to collect from Mr. and Mrs. Canning, as they have obtained a discharge of personal liability in bankruptcy. Mr. and Mrs. Canning are not personally liable to make any payment on their mortgage loan, and any payment that Mr. and Mrs. Canning may make is voluntary. Because Mr. and Mrs. Canning received a discharge under the United States Bankruptcy Code, they have no personal obligation under the note, or for any of the amounts shown above. This letter is not an effort by HSBC to collect, assess, or recover a claim against a discharged customer. The information in this letter is being provided in response to your request.[10]

Characterizing the response as a further violation of the discharge injunction because of its refusal to "either release the lien or foreclose on the property," the Cannings' counsel gave HSBC another 15 days to act before filing this adversary proceeding.[11]

---

6. T. Sambatakos letter dated August 20, 2009, Stip. Ex. 5.

7. *Id.*

8. *Id.*

9. T. Sambatakos letter dated October 1, 2009, Stip. Ex. 6.

10. HSBC [Beneficial] letter dated October 19, 2009, Stip. Ex. 7.

11. T. Sambatakos letter dated November 6, 2009, Stip. Ex. 8.

HSBC responded quickly, denying that it had violated the discharge injunction by forbearing foreclosure and retaining its mortgage lien. It stated, "We maintain that we will not release the lien on the above account until the balance is satisfied in the amount of $186,324.18." It reiterated its willingness to discuss "a settlement offer or a short sale," and again invited the Cannings to contact its representatives.[12] In response, the Cannings informed HSBC that they had abandoned the property and that they had advised the town and utility companies that HSBC was the responsible party for the obligations on the home.[13]

HSBC has yet to foreclose on its mortgage or release its lien. The Cannings no longer reside at the Sanford property, which remains vacant. The appraised value of the property was $86,000 when the order for relief entered. In February 2010, nearly a year after the Cannings' filing, its appraised value had fallen to $75,000.

### Procedural History

Notwithstanding their extensive correspondence, the parties remained at impasse, whereupon the Cannings initiated this adversary proceeding seeking sanctions for HSBC's alleged violations of the discharge injunction. The parties have agreed to bifurcated treatment, presenting solely the issue of liability and reserving evidence and argument regarding sanctions, if appropriate.

---

**12.** HSBC [Beneficial] letter dated November 13, 2009, Stip. Ex. 9. The letter also included an express disclaimer to the effect that it did not represent an effort to collect the debt from the Cannings personally. It recognized the vitality of their discharge and their lack of any ongoing personal obligation. *Id.*

**13.** Cannings' letter dated December 3, 2009, Stip. Ex. 10. The letter not only stated that the Cannings, individually, were no longer responsible for the debt to HSBC, it explained

### Discussion

### The Law

■ While § 362(a)'s automatic stay is the key Code provision providing debtors "breathing space" to reorganize, or for an orderly liquidation to take place, § 524(a)'s discharge injunction provides the "fresh start" to which honest debtors are entitled. *See, e.g., Bessette v. Avco Fin. Servs., Inc.,* 230 F.3d 439, 444 (1st Cir.2000). It provides:

> (a) A discharge in a case under this title—
>
> > (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived ...

■ "Discharge carries with it an injunction against debt collection efforts. The injunction imposed by Code § 524(a)(2) is intentionally broad in scope and is intended to preclude virtually all actions by a creditor to collect personally from the debtor." William L. Norton, Jr., 3 Norton Bankr. Law & Prac. § 58.3 (3d ed. 2011).

■ The discharge injunction is appropriately enforced via § 105, which empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions. *Pratt v.*

---

that electrical and water service had been "turned off" and that the structure was "without heat." *Id.* It informed HSBC that the "Town of Sanford as well as the Sanford Sewerage and Water companies has [sic] been notified that you [HSBC] are the responsible party for [the] property." *Id.* The letter also provided contact information for the Cannings and asked that HSBC "file the Foreclosure complaint."

General Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 21 (2006); Bessette v. Avco Fin. Servs., 230 F.3d at 444; see, also, In re Schlichtmann, 375 B.R. 41, 94 (Bankr.D.Mass.2007). Among other things, damages for contempt may be awarded to compensate a debtor injured by a discharge injunction violation. In re Pratt, 462 F.3d at 21. A court's contempt power is potent and potentially damaging; courts levying sanctions must exercise restraint. See Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir.1991).

■ Here, the Cannings assert that HSBC should be held in contempt for violating the discharge injunction. A bankruptcy discharge relieves the debtor of personal liability for pre-petition debts. Absent avoidance or modification, a discharge does not affect a secured creditor's lien in its collateral; the lien survives and is enforceable after the bankruptcy proceedings in accordance with state law. In re Pratt, 462 F.3d at 17.

■ Relying on In re Pratt's formulation, In re Schlichtmann set forth a two-part test for analyzing assertions of contempt for violations of the discharge injunction. The debtor seeking a finding of contempt must prove: (1) that the alleged contemnor committed an act that violated the discharge injunction with general intent to commit the act; and (2) that it acted with knowledge of the discharge order. 375 B.R. at 96. In assessing whether the act violated the injunction, the court must consider the factual context to determine if the action operated to coerce or harass the debtor improperly. See In re Schlichtmann, 375 B.R. at 96; In re Pratt, 462 F.3d at 19.

■ Surely, the Cannings bear the burden of proof to sustain their plea for sanctions. See id. The measure of that burden, whether a preponderance of the evidence or clear and convincing proof, is uncertain in this circuit. While putting a fine point on the issue, Pratt declined to resolve it. In re Pratt, 462 F.3d at 21 ("the distinction ... between preponderance of the evidence and clear and convincing evidence entails the quantum of proof; viz., how much of this factual evidence of knowledge and general intent the debtor must adduce to survive a 'sufficiency of evidence challenge.' "). Thus, the quantum of proof to establish knowledge of the discharge, the general intent to perform the act that violates it, as well as the fact of the act's commission, remains uncertain. See id. (collecting authorities).[14]

For today, determining the appropriate burden of proof is unnecessary. As discussed below, though HSBC's post-discharge correspondence clearly violated the discharge injunction, it's refusal to foreclose upon or release the Cannings' real estate immediately upon their post-discharge demand did not even closely approach a violation.

**The Conduct**

There is no question that HSBC committed the acts of which the Cannings complain; there is no question that it in-

---

14. In Project B.A.S.I.C., the court said the order involved must be clear and unambiguous and it must clearly have been aimed at the alleged contemnor's conduct. See 947 F.2d 11 at 16. Those points are issues of law, not of fact. Though the legal prerequisites for relief must be clearly established, it does not necessarily follow that the burden of proof must be "clear and convincing". Certainly,

one could understandably question why violations of the automatic stay, a form of interim relief, need only be proved by a preponderance, while evidence adduced to effect the Code's permanent relief, a fresh start, must meet a higher burden. See Fleet Mortg. Group, Inc. v. Kaneb (In re Kaneb), 196 F.3d 265, 269 (1st Cir.1999).

tended to commit them. Neither is there question whether it was aware of the Cannings' discharge. As to each assertedly contumacious act, the sole issue is whether its commission violated § 524(a)(2)'s proscription.

### 1. Post Discharge Dunning

■ HSBC's August 3, 2009, letter to the Cannings, dispatched approximately nine weeks after they received their discharge, informed them that they "still have a financial obligation to repay HSBC for the money that was borrowed...."[15] The letter, which purported to reserve to HSBC all of its "rights and remedies" under the Cannings' loan agreement, spoke as though the Cannings' personal liability endured after their discharge and invited the Cannings to "manage" their "account" through HSBC's website.[16] Moreover, even in the face of counsel's prompt attempt to set the record straight, HSBC failed for nearly two months to retract its assertion of ongoing personal liability.

The letter, and HSBC's stance in the weeks thereafter, plainly qualifies as an "act to collect, offset, or recover" a discharged debt, *viz.* the Cannings discharged personal obligation to repay their mortgage loan. Determining the damages that the HSBC demand occasioned and what sanctions are appropriate to rectify the violation are questions that can be answered only after further evidence is adduced.

### 2. Refusal to Foreclose or Release the Mortgage

■ Relying on the First Circuit's decision in *Pratt*, the Cannings contend that by refusing to foreclose or release its mortgage HSBC frustrated their right to surrender their home and attempted to coerce them to answer personally for their discharged debt.

*Pratt* held that a secured creditor could violate the discharge injunction by refusing to take possession of surrendered collateral or release its lien *in certain circumstances. See In re Pratt,* 462 F.3d at 19–20. The collateral at issue in *Pratt* was a "worthless" car for which the Court of Appeals could envision no "reasonable prospect" its sale would ever generate proceeds for the secured creditor. *Id.* at 20. Nonetheless, the secured creditor stood on its state law right to be paid in full before releasing its lien. *Id.* The debtors were faced with "the grim prospect of retaining indefinite possession of a worthless vehicle unless they paid the loan balance, together with all the attendant costs of possessing, maintaining, insuring, and/or garaging the vehicle." Id. The court determined that the secured creditor had not, and would not be able to, credibly provide an objectively reasonable justification for refusing to repossess the car or release its lien. It therefore held that the creditor had attempted to realize upon the discharged obligation in order to "coerce" a reaffirmation agreement from the debtors, frustrating their right to surrender the collateral and depriving them of their right to a "fresh start." *Id.*

The Cannings argue that HSBC has similarly attempted to coerce full payment of its undersecured debt, and, thus, to collect from them personally. They point to the declining value of their real estate, analogizing to the worthless car in *Pratt.* If the property was not worth foreclosing upon, and if, at the same time, HSBC would not release its mortgage, they argue they are left with a millstone around their

---

**15.** *See* text *supra* at n.5.

**16.** *Id.*

necks unless and until they pay the lien in full—including the discharged portion.

The analogy to *Pratt* is rough. The Cannings' argument neglects telling points that distinguish the two cases. Though HSBC is undersecured, its collateral is real estate, not personal property. The Cannings' demand of "foreclose or release, now" ignores the prospect that real estate values change (up, as well as down) over time. A critical component of *Pratt's* holding was the collateral's worthlessness and the fact that, unlike real estate, "vehicles rarely appreciate in value over time." *Id.* Moreover, unlike the Pratts' secured creditor, HSBC did not simply require that the Cannings "pay in full." Rather it responded by suggesting either a voluntary settlement or a "short sale."[17] That invitation plainly reveals that HSBC sought to collect no more than the value securing its lien.

The Cannings contend that HSBC was obliged to foreclose on their command or, alternatively, to release outright collateral worth approximately $75,000. The collateral is not worthless. *In re Pratt*, 462 F.3d at 20; *Cf. In re Groth*, 269 B.R. 766, 767–68 (Bankr.S.D.Ohio 2001) (addressing a creditor's refusal to release worthless personal property). HSBC's refusal to act in response to the Cannings' ultimatum of "foreclose or release" neither objectively operated to coerce the Cannings to pay in full, nor did it frustrate their § 521(a)(2) surrender rights.[18]

 Of course, HSBC's chosen course of action, or inaction, did not make things easy for the Cannings. Forces remained at work that could make their con-

tinued ownership of the real estate uncomfortable—forces like accruing real estate taxes and the desirability of maintaining liability insurance for the premises. But those forces are incidents of ownership. Though the Code provides debtors with a surrender option, it does not force creditors to assume ownership or take possession of collateral. And although the Code provides a discharge of personal liability for debt, it does not discharge the ongoing burdens of owning property. *Cf. Foster v. Double Ranch Assn. (In re Foster)*, 435 B.R. 650, 653 (9th Cir. BAP 2010) (Postpetition condominium homeowners' association fees accrue as an incident of debtor's continuing ownership and are not dischargeable in Chapter 13).

### Conclusion

HSBC violated the discharge injunction when it demanded payment from the Cannings and insisted their obligation to pay was unaffected by their bankruptcy discharge. It did not, however, violate the discharge injunction by failing to foreclose upon or release its mortgage on valuable real estate at the Cannings' post-discharge insistence.

A hearing will proceed to address the nature and extent of sanctions that should enter to address HSBC's discharge injunction violation.

---

**17.** *See* text at n.10 *supra.*

**18.** The *Pratt* court made clear that "surrender" means that the debtor agrees to "make the collateral *available*" to the secured creditor. *Id.* at 18, and that nothing in the

§ 521(a)(2) requires a secured creditor to whom collateral is "surrendered" to accept or take possession of it, or to foreclose upon it at the debtor's demand.